PARIS M. WALKER, NANCY HAGOOD, JESSIE FRANKS as Trustees and
as Beneficiaries Under a Trust Established by the Will of JAMES
D. LANKFORD, Appellants, v. A. LAMKIN JAMES, Administrator
of the Estate of ALBERT R. JAMES.—85 S. W. (2d) 876.

Division Two, September 3, 1935.

*Thomas Hackney* and *Glenn R. Donaldson* for appellant.

*J. T. Montgomery* and *W. T. Bellamy* for respondent.

COOLEY, C.—Action in equity for an accounting. The circuit court rendered judgment for the defendant, except as to one item of $25.50, for which plaintiffs had judgment. Plaintiffs have appealed. The suit was brought by Paris M. Walker, Marian Garrard and Nancy Hagood, as trustees and beneficiaries, plaintiffs, against Albert R. James, defendant. Since the trial below James has died and his administrator has been substituted as defendant. Marian,

Garrard, one of the plaintiffs below, has died and Jessie Franks has succeeded to her interest and has been substituted for her as a party plaintiff.

James D. Lankford died testate about December, 1912. By his will, which was duly probated, he left his estate to trustees, to be selected as in the will provided. The will made certain specific bequests, which have been paid, and left the bulk of testator's estate in trust for said Paris M. Walker, Marian Garrard, Nancy Hagood (original plaintiffs herein) and Belle G. Lankford. Belle G. Lankford died about 1915, whereupon, under the will, her interest passed to the said original plaintiffs, to whom we shall refer as plaintiffs. It is admitted that the plaintiffs below were the sole beneficiaries of the trust. They were also trustees and they sued in the dual capacity of trustees and sole beneficiaries. The provisions of the will relating to the trust, so far as necessary to an understanding of the issues herein, are thus set forth, partly *in haec verba* and partly by summarizing, in appellant's abstract of the record:

"FIFTH: 'All of said property hereby conveyed in trust, for the use and benefit of the said Belle Lankford, Paris M. Walker, Marian Garrard and Nancy Hagood, respectively, to be held, managed and invested by said trustees, in their sole discretion, except as hereinafter provided; the rents, issues, profits and income thereon is to be collected by them, the said trustees, and by said trustees paid over to said named parties annually; each of said parties taking the income and profit accruing upon the share allotted to him or her.'

"SIXTH: Provides for succession by direct heirs upon the death of any beneficiary.

"SEVENTH: 'Immediately upon my death, I desire and direct that Paris M. Walker, Marian Garrard, Belle Lankford and Nancy Hagood (being four of the legatees mentioned in this will), or a majority of them, shall select, designate and name at least three persons, to become the trustees under this my will and to receive and hold the title to my property and estate, and to manage, and distribute the same, as by this will is contemplated. I suggest that at least one of said trustees, so selected, be a good business man, outside any legatees mentioned in my will and others of said trustees may be from among the legatees mentioned in my will. . . .'

"Then follows provision for bond to be given by the trustees, and a proviso that settlements need not be made in the circuit court, and that the trustees shall exercise their powers 'according to their best judgment and discretion.'

"EIGHTH: 'My said trustees, shall upon qualification as such, as above provided, immediately meet and organize as a Board of Trustees, and shall select from their number, a manager, who shall be the agent of the Board, and who shall have the general superin-

tendence of the business and affairs of my estate, and the active management of the same, and shall as such manager, have the custody of all the deeds, bills, bonds, notes, evidences of indebtedness or other personal assets of my estate and who shall have the management of my real estate, and the leasing of the same under the direction of the Board, and who shall have the collection of rents thereon, and who shall receive and receipt as said manager, for all interest, dividends and profits of my estate, and collect and receive any and all moneys, due the same and as the same becomes due (except that he shall not change any investment, as the same may be found upon my decease, or afterwards made by the Board of Trustees, without the order and direction of the Board first made), and he shall discharge all of the debts of my estate and pay out all moneys that may be necessary in the management of the same and for the expenses of administering the same under this will, and shall pay over to the legatees under this will, such portions of my estate or of the income and profits thereof, as they may be respectively entitled to, from time to time, and as such payments shall from time to time be ordered by the Board. And said manager shall in all things be subject to the superintending control and orders of the Board, and he shall in all matters consult freely with said Board and individual members thereof, and he shall keep a strict account of his proceedings, and of all moneys and properties coming into his hands, as well also of all expenses and disbursements, in books provided therefore by the Board, and which books shall remain and be kept under the control of said Board of Trustees, and subject to examination at any and all times, by said Board of Trustees or any member thereof, and by any legatee of my estate. All contracts and memorandums made concerning any of the property of my estate shall also be filed with and remain with said Board and under its control. Said manager shall hold his position as such during the pleasure of the Board, and may for good cause be removed by the Board, at any time, and a successor appointed in his stead, and he may be required by said Board of trustees to make a Final Settlement of his accounts, and required thereupon to turn over all moneys and properties of the estate in his hands or under his control, or which should properly be, to his successor or to said Board of Trustees, directly.'

"NINTH: 'Said Board of Trustees shall meet as a Board, regularly, once each year, and as much oftener as in their judgment or in the judgment of the majority of them, it may be necessary, in order to properly safeguard the interest of said estate, and properly administer the same, and said manager shall, at the end of one year from his appointment as such, unless sooner required by the Board so to do, make a settlement with said Board of his accounts, showing the moneys and properties coming into his hands or under his

control, and the source from which derived, including also the disbursements made by him, to whom made and upon what account, together with proper vouchers and showing the balance upon hand at such time and how invested. Said settlement shall be reduced to writing by said manager, and sworn to by him as correct and true, and filed with said Board; said Board of Trustees shall examine the same and if found to be correct shall approve the same and cause the same to be so endorsed, and enter such facts upon its records. If found to be incorrect, it shall be corrected in accordance with the facts.'

" 'Said manager shall annually thereafter be required to file and make a like settlement with such Board, showing the balance in his hands at the last previous settlement and the amounts received, and from what source since the last previous settlement, together with disbursements and to whom made and upon what account, since said last previous settlement together with proper vouchers, and showing the balance upon hand and how invested at such time. And said Board shall annually examine said settlements, and if found correct, approve the same and cause such approval to be endorsed on said settlements, and note such facts on its records. And provided; that said Board of Trustees, may at any time require a settlement to be made and filed by said manager, whenever, in their judgment it is deemed advisable so to do; which settlement, however, shall not dispense with the necessity of an annual settlement.'

"TENTH: Provides for an inventory.

"ELEVENTH: Designates the source of information in regard to the estate and its location.

"TWELFTH: Provides that the Board shall be self-perpetuating.

"THIRTEENTH: 'It is my will that my trustees continue all my investments as they find them at the date of my decease, so long as the same remain safe and productive, but the same may in the discretion of said Board, or two-thirds thereof, be changed from its form at my death, provided the same be immediately reinvested, in real estate at the fair market value, or in real estate notes and mortgages bringing the best rate of interest obtainable and secured by first lien upon real estate, which at its fair market valuation, doubles in value the amount of said note. And all loans and investments thereafter made shall be either in real estate at its fair market value, or real estate notes secured by first mortgage liens upon real estate of twice the value of said loan. To such ends and for such purpose my said trustees have the power and authority under this will to sell any real estate of which I may die seized, or any real estate which they may hereafter purchase and hold as part of my estate, and they have the power to sell, assign, transfer and sell any notes, stocks, bonds or evidences of indebtedness which I may hold at the time of my death, or in which they may hereafter invest

any of my estate, and all of the moneys and properties arising from said sales, and all the reinvestments made by them, to be held upon the exact same trusts as the property originally conveyed and passing under this will to them at the date of my death. But no investments are to be made or changed or property sold or conveyed by my said trustees, except 'upon the order of the Board of Trustees first made and entered of record upon the record book of their proceedings. My said trustees are fully authorized as such, to make all proper conveyances of any of my property, including the execution of deeds and other instruments. My said trustees shall cause all notes, bonds, stocks, deeds, etc., representing any investment or purchase made by them for my estate, to be taken in the names of said trustees of my said estate, and said trustees are fully authorized, when in their judgment and discretion, any investment as found at the date of my death, has become insecure or unprofitable, or liable to waste or loss, to immediately collect or convert the same into cash, to reinvest, however, as hereinbefore provided, and as soon as can be judiciously done.'

"FOURTEENTH: Provides for separate bond for the manager.

"FIFTEENTH: Provides the manager to be paid as the Board may consider proper and just.

"SIXTEENTH: 'My said Board of Trustees shall from time to time direct the payment of the income and profits of my estate to the respective legatees, as herein provided, and shall cause the same to be paid over to them, according to their respective interest, annually, and oftener if in the judgment of the Board it is best so to do. A majority of said Board of Trustees shall constitute a quorum for the transaction of any business concerning my estate, and may be called together at any time, whenever a majority of the members thereof so desire; provided all members be given notice of such call except when meeting upon a regular adjournment. All orders of the Board shall be entered upon the records of the Board.'

"SEVENTEENTH: Directs the Board to consider safety and income in making investments.

"EIGHTEENTH: Provides that the will shall be filed and probated and that administration be avoided if possible, and further provides that the legatees may for reason change the trustees and that 'all my trustees other than one, shall be selected and named from among my legatees and beneficiaries under this will.' "

Upon the death of James D. Lankford and the probating of his will plaintiffs and Belle Lankford, pursuant to that instrument, elected themselves and Albert R. James, defendant below and whom we shall call defendant, trustees. Said trustees qualified and selected defendant as manager. He accepted the appointment, gave bond, and thereafter acted as such manager until about June, 1931, a period of some eighteen years, when, upon request of the other trus-

tees, he resigned as trustee and manager, made a final settlement and turned over to the board of trustees all assets of the trust estate in his hands. The board accepted the assets and appointed a new manager. Several months later plaintiffs brought this suit, alleging that defendant had made improper investments and loans, constituting breaches of trust and resulting in loss to the estate, and asking for an accounting and that defendant be required to take back and keep certain designated items and substitute therefor to the estate cash equivalent to the face value of said items. Originally there were eighteen or nineteen of such items named in the petition. It is stated in appellant's brief that pending this appeal defendant's successor has obtained additional security on some of those items or otherwise worked them out satisfactorily so that there now remain in dispute eleven designated items, aggregating $16,350.

Defendant was a lawyer of high professional standing, a man of unimpeached honesty and integrity. It is not and under the evidence could not be contended that he misappropriated any of the trust funds or property or was guilty of any fraud, bad faith or intentional wrongdoing. The contention is that he failed to exercise the high degree of care and diligence in making loans and investments that the law requires in the handling of trust funds. Defendant, although he was in fact a cotrustee with plaintiffs, is not sued in his capacity as cotrustee but rather in his capacity of manager and as *such manager* the person in actual control and management of the estate, both as regards ministerial and discretionary duties, in effect acting as sole trustee. Plaintiffs' petition alleges that they and Belle G. Lankford met and organized as the board of trustees and employed defendant as manager, pursuant to the will; that defendant "accepted and entered into said position of trust as manager for said trust estate," continued "as such manager" until about July 1, 1931, and:

"That during all of said time the said James collected and reinvested the assets of said trust upon his own initiative and in his own discretion, and in so doing acted as the Agent and Trustee and stood in a position of trust in his relation with the said beneficiaries; that it was the duty of said James as such a Manager, Agent and Trustee to reinvest the proceeds of said trust in his hands under the provision of said will and trust instrument as follows: 'and all loans and investments thereafter made shall be either in real estate at its fair market value, or real estate notes secured by first mortgage liens upon real estate of twice the value of said loan,' and that it was the duty of said James to make such investments in a manner and upon security as would meet the approval of a reasonably prudent man in the same or similar relation and in and to the satisfaction of his judgment as Trustee, enlightened and guided by the approved rules applicable to the investment of trust funds, and not to his unin-

formed personal judgment exercised without reference to legal rules and principles thereto appertaining.

"That the said James in violation of his duty to said trust made certain investments as hereinafter set out which were not in real estate at its fair market value nor real estate notes secured by first mortgage liens upon real estate of twice the amount of said loans and were not such investments as would be made and approved by a reasonably prudent man acting as such Trustee."

At the time of his death James D. Lankford had a considerable number of notes secured by mortgages on real estate in the neighborhood of Durant, Oklahoma. These are called in the record the Durant loans. Defendant, called by plaintiffs as their witness, testified that the inventory taken immediately after the organization of the board of trustees showed thirty-six such loans, aggregating $25,000. For a number of years prior to his death Mr. Lankford had owned stock in a corporation at Durant managed by Whale & Cox. This company is referred to in the record as "Mr. Cox's company" or as Whale & Cox. Later a Mr. Albin became associated with Whale & Cox. For the purpose of this case that company may be referred to as Whale & Cox. Mr. Lankford had made his Oklahoma loans through Whale & Cox, permitting them to make loans for him according to their own judgment, to attend to the examination of titles, to determine the sufficiency of the security, to retain the original loan papers and when loans were paid to hold the money until it was reloaned. He appears to have had entire confidence in Whale & Cox,—a confidence which does not appear to have been abused. When the board of trustees organized they investigated these loans, concluded that they were solvent and decided that "the notes down there were not to be taken up." Mr. Walker, president of the board of trustees, testified that "The investments were to be continued as our uncle had formerly done with Mr. Cox's company."

The record shows that all of the trustees concurred in that decision and in effect directed defendant to continue the business about Durant as James D. Lankford had conducted it up to the time of his death. The evidence as a whole also justifies the conclusion that Mr. Cox, or his company, during the time the Durant loans were being made, was the agent of the board of trustees rather than, as plaintiffs now contend, the agent of defendant. Defendant's evidence clearly so shows, and Mr. Walker himself in effect so testified. He said:

"Q. You were satisfied with them (the Durant loans) as Mr. Cox's company had made them? A. Mr. Cox himself was our agent or Uncle James' agent. . . .

"Q. I mean from 1913 up to about 1926, this money was left right down there with Cox and Company at the behest and the request of

the board of trustees and loaned there by Cox and Company right along? A. Up to that time, Cox loaned it, he was our agent, yes."

During the period from 1913 to 1926 loans made by Cox or his company aggregated in number about 135 and in amount about $152,000. During that time defendant's annual reports referred to and listed loans that had been made by, and money in the hands of, Cox or his company as "agents for the trustees" and no complaint was ever made by the trustees or any of them that such designation was not correct.

Mr. Walker further testified, "At the first meeting the trustees placed all the estate business in the hands of Mr. James, and thereafter neither myself as chairman of the board nor the other trustees paid any further attention to it." That bit of testimony fairly well summarizes the conduct of the trustees. For a few years they appear to have held an occasional—rather perfunctory—meeting, but for twelve years or more prior to defendant's resignation they did not hold any meetings, and paid no attention to the management of the trust, leaving everything to defendant and being concerned, apparently, only with the amount of the dividends they were regularly receiving from the trust estate. According to defendant's testimony, which from the whole record we believe entitled to credence, he frequently conferred with members of the board, especially the president, about investments and the affairs of the estate and from time to time requested the president of the board to call meetings of the trustees to consider investments he had made or contemplated making, but the president failed to do so, assuring defendant that what he was doing or might do was and would be satisfactory and telling him to use his own judgment. The other trustees gave defendant similar assurances and directions to use his own judgment. Defendant made detailed annual reports to the board of his handling of the trust estate. But little examination of these reports was made by plaintiffs, and no protest or suggestion as to the handling of the business was made by any of them.

Up to about 1926 there was no loss sustained or threatened on account of any of the loans or investments of the trust fund. Beginning about 1926 defendant began having some difficulty in collecting interest. The business depression and the depreciation of real estate values—too well known to require comment—with the resultant inability of debtors to meet their obligations, were operating in the vicinity of Durant, as elsewhere throughout the country. In the section around Durant those untoward conditions were intensified by several successive cotton crop failures. Resulting from all those adverse conditions the makers of a number of the Durant loans defaulted in payment of their interest and in payment of taxes. Defendant in several cases foreclosed the mortgages, buying in the properties and for convenience, taking title in his own name

as manager... In other cases he still held the notes at the time of his resignation, but on some of those notes still held by the trustees, as well as on the properties that had been taken over on foreclosure, there will doubtless be a loss. All those notes and properties were duly transferred by defendant to the trustees and were accepted by them when defendant resigned and made his final settlement. Some of them, as intimated above, have since been satisfactorily worked out. On the real estate so taken over the trustees, through defendant's successor, have collected some rents, but not enough to pay interest, taxes and upkeep. In the list of eleven items still in dispute there are seven that fall within the category last above described and may appropriately be referred to as the Durant loans. Of those seven items it may be said generally that, under the evidence, as the circuit court found, the properties were not, *at the time of the trial*, worth enough to make the loans good. But those loans were all made prior to 1926 and there is evidence in the record from which we think it may justly be found that those properties might reasonably have been considered worth double the amount of the respective loans when the loans were made. They were so considered and so reported by Whale & Cox to defendant at the time they were made and there is nothing in the record to impugn the good faith or competency of Whale & Cox.

One of said eleven items is referred to as the L. O. Cook loan. It consists of two notes of $1000 each, constituting part of an $11,000 loan secured by first mortgage on an apartment building at Tulsa, Oklahoma. Defendant bought those two notes about July, 1923. He took an assignment to himself personally, but the court found, and we think the evidence justified the finding, that he did not buy the notes for himself and "was not the owner thereof." He assigned one note to himself as guardian of Mary F. Boatright, whose estate he had in charge. Later, needing money in the Boatright estate, he, as guardian of that estate, sold and transferred that note as such guardian to himself as manager of the Lankford estate. The other $1000 he assigned to himself as manager of the Lankford estate. The interest on both said notes has been paid to February 5, 1931—there having been no default in interest up to the filing of this suit. There is some evidence tending to show that the property securing that loan was not at the time of the trial worth double the amount of the loan; other evidence tending to show that the property may well have been considered and was considered of sufficient value to comply with the requirements of the will at the time the notes were assigned to defendant as manager. Defendant testified that he investigated this loan and inspected the property before buying the notes, and from such inspection, the rentals then being paid and the information as to real estate values which he received the property

appeared to be well worth double the amount of the loan. He testified similarly as to the Adams loan, next to be mentioned.

The Adams loan consisted of five notes, one for $1000, two for $500 each and two for $100 each. . It does not appear from the evidence that any loss has occurred or will likely occur to the estate on this loan, though plaintiffs had some evidence tending to show that the security—real estate in Tulsa, Oklahoma,—is not worth double the amount of the total loan. On this item plaintiffs claim that defendant first bought the notes for himself and then sold them to himself as manager and charged a commission for making the sale. Defendant testified that he first bought one $500 note for the Lankford estate, subsequently transferred it from that estate to the Boatright estate and later, needing some cash in the latter estate, retransferred that note to the Lankford estate. The alleged commission charge was in connection with the purchase of the other Adams notes aggregating $1700. Relative to that matter defendant testified that the total loan on the property amounted to $4000; that he could not "handle the full amount," but could handle part of it; that the holder of the notes offered to pay him a commission of one and one-half per cent if he could dispose of all of the notes; that he disposed of all but $1700 to other parties and took the $1700 for the Lankford estate and received a commission amounting to one and one-half per cent of the total $4000. He said he regarded the commission paid him as compensation for the sale of the other notes. He testified:

"Now, if I am liable for this I want to pay it; I don't want a single thing in this case I am not entitled to, whether or not you want to construe that what I got, it was for the sale of these other notes. Do you want to put that construction on it or whether you put the construction I profited by commission on the sale of $1,700.00. I will say those are the facts about it. If I am chargeable with that, I want to pay it; I haven't any inclination to withhold a cent from this estate. I done everything I could to make a profit for this estate over these years."

The court found that the notes amounting to $1700 were first assigned to defendant personally, but were not owned by him, and that he then "sold" said notes to the estate and retained for himself a commission of one and one-half per cent on said sum for making such sale. The court in its judgment required defendant to account for that commission, amounting to $25.50, for which amount plaintiffs were given judgment.

The remaining items in dispute are certain bonds which defendant bought for the estate in 1929, viz.: $3000 of bonds called in the record the Madison-Clark bonds, and $1100 of bonds called the Kenshire Apartment bonds. The Madison-Clark bonds were part of a large issue put out by the Madison-Clark Building Corporation, of Chicago, Illinois, secured by first mortgage on a twenty-three story

building, but the issuing corporation, while owning the building, did not own the ground on which it stood. It had a 99-year lease thereon, running from about 1926. At the time of the trial herein the building was "completed on the outside" and much of the space was rented, but there remained considerable work to be done in the way of partitions, etc., before all of the space on some floors could be made practically available. Interest had been paid on those bonds to March 16, 1930.

The Kenshire Apartment bonds were also part of a large issue executed by a Chicago company secured by first mortgage on a large apartment building in Chicago. That company owned the ground on which the building was being erected. The building was not completed. Interest on those bonds was paid to April 15, 1930.

At the time of the trial the companies that had issued the Madison-Clark bonds and the Kenshire Apartment bonds were both in the hands of receivers and insolvent. Plaintiffs' evidence tends to show that at the time of the trial real estate values in Chicago, for properties such as those in question, were probably thirty per cent less than in 1928 and 1929, and that all of those bonds are now of doubtful value.

Defendant testified that he bought those bonds for the estate from Newton & Company, an investment company of Marshall, Missouri, from whom he had bought many loans; that he was acquainted with the members of the firm of Newton & Company, had known the firm for twenty-five or thirty years, knew their methods of doing business and the character of loans and investments they made and that their reputation for making conservative loans was absolutely good; that Newton & Company had bought the bonds for themselves and owned them; that before purchasing he obtained from Newton & Company "literature" (or circulars) regarding the proposed investments, also other information, some of the members of the firm having gone to Chicago "and inspected the matters and reported back" to him, but that he did not himself go to Chicago to inspect the properties or make investigation there, relying upon the literature and information furnished him by Newton & Company, except that he learned that two other men, bankers, whom he named, had invested in those bonds; that he thought the bonds were good securities and the interest rate was higher than any other investment he could make that appeared to be safe. He further said that when he bought the bonds he though that the buildings had been completed.

At the time of rendering judgment the learned circuit judge filed, with the judgment of the court, a written opinion which is presented to us in respondent's additional abstract. While not legally a part of the judgment we think this opinion fairly summarizes the facts and the situation presented by the record and we therefore take the

liberty of quoting from it. After summarizing at length the pleadings and the provisions of the will relative to the trust, it says:

"A reading of the will shows without doubt the trustees and the board of trustees were not to be mere figureheads, but were to be active and were clothed by the testator with real functions and real duties to perform. All through the will stress is placed upon the trustees and the board and by the instrument active participation in the affairs of the estate was contemplated. The evidence shows the beneficiaries and the plaintiffs, trustees, were one and the same individuals. The evidence shows the plaintiffs, trustees, insofar as active management of the estate under the terms of the will was concerned, wholly disregarded that instrument. Although requested by the manager meetings were not held as provided by the will. Loans were not made and passed upon by the plaintiffs as the will contemplated. The affairs were left almost, if not entirely, in the hands of the defendant manager. Annual settlements submitted by the defendant were received and approved without being understood by the plaintiffs, or, as one plaintiff trustee testified without out even having been read. The plaintiffs doubtless considered that as they were the only ones interested they need not especially concern themselves with the affairs of the estate and could disregard the provisions of the will imposing duties upon them; they doubtless thought they had the right to leave all matters pertaining to the estate to the defendant manager in whom they trusted and had implicit confidence. They finally reached a state of mind and a state of inactivity where they concerned themselves only with accepting their distributive shares which they received for thirteen years without default. For thirteen years, namely, up to 1926, the investments were unquestioned and uninvestigated by the plaintiffs; they left everything to the defendant; they made no complaint while the profits were forthcoming. In fact, after adversity came in 1926 they still permitted the defendant to handle the estate as he had done and made no complaint. For 18 years no complaint was made, but the settlements were received by them and to some extent, at least, approved. For 18 years no active participation was had by the plaintiffs who were interested in the estate in the dual capacity of trustees under bond and as beneficiaries, sole and exclusive beneficiaries.

"As to the Cook and Adams loans the defendant never owned the same or had any interest therein nor profited thereby except as shall be hereafter mentioned. Under the circumstances disclosed by the evidence considering the Oklahoma loans as he found them and as the testator wished them, this court cannot say the defendant was negligent and did not act as a reasonably cautious agent would have done. They and also the Chicago investments, it seems to this court, were made with that degree of prudence and care and inves-

tigation that men in business usually exercise, although to be sure not with the strict and high degree of care and caution which the law imposes upon a trustee acting as such, but the plaintiffs unwilling to assume responsibility themselves constituted the defendant their agent and it was the plaintiffs themselves who lulled the defendant into a belief that they, as the only ones interested in the estate, were satisfied with and approved of his management of the estate and would abide by any acts he might perform. As a matter of common sense it would seem they are now estopped to deny (claim?) that his conduct in the management of the estate was wrongful. As beneficiaries the plaintiffs were, without doubt, unaware in detail of the loaning and investing of the funds by the defendant, but as trustees the plaintiffs undoubtedly ought to have been aware and ought to have known in detail of such loaning and investing of the funds by the defendant and ought to have kept themselves advised of the matters of which they now complain. Of course, the authorities all hold that mere silence will not raise estoppel, but as trustees the plaintiffs were charged with knowledge of affairs.

"We have here the situation of certain sole beneficiaries under a will upon whom were imposed active duties as trustees under the will, wholly ignoring such duties, making no effort to be informed as to loans from the funds in question, but trusting the whole matter to a cotrustee in disregard of the will over a long period of time accepting the fruits of the trust from the cotrustee, and then when a part of the loans proved unremunerative seeking to hold liable the cotrustee for violating the provisions of the same will, namely, the one which they themselves disregarded and permitted him to disregard. The plaintiffs doubtless took the position that if they chose to turn everything over to the defendant to act for them no one else had a right to complain, since they, the plaintiffs, were the sole beneficiaries. As this court sees it, the decisive element in the case is the fact that the plaintiffs were not only the trustees who disregarded the will, but they were the sole and exclusive beneficiaries as well. Had any of the plaintiffs been either a beneficiary or a trustee, without being both, the situation would be an entirely different one.

"When the final settlement was made the plaintiffs took from the manager all property, real, personal and mixed, belonging to the estate and had (have?) ever since been claiming it and getting the rents and profits therefrom. They still hold the property and, without even an offer to return, asked the court, as a court in equity, to compel the defendant to replace such notes, mortgages and investments with money equal to the amount of said investments and that the plaintiffs have and recover judgment of and from the defendant for the amount which they claim is due the trust estate.

"Both sides recited numerous authorities which are undoubtedly

sound propositions of law, such leading cases as the Cornet case and such propositions as are enunciated in Perry on Trusts and in Pomeroy are not to be disputed. But as this court sees it, this case is not so much one of general law applying to trustees in general as it is one of fact. . . .

"There is no evidence that in all the dealings of the defendant with the estate he ever personally profited, except as to Item 17, he profited to the extent of $25.50 commission. Whether the defendant be held to the strict accountability of a trustee or not, he will not be allowed to retain the profit made and under the amendment to the plaintiffs' petition filed, by leave of court, judgment will be rendered for the plaintiffs against the defendant in the sum of $25.50, each side to bear its respective costs."

■ Under the will by which the trust was created defendant as manager had certain ministerial duties to perform under the control and supervision of the trustees. The will says he shall be the agent of the board of trustees. But from a reading of that instrument it is patent that the discretionary duties and authority, such as changing existing investments and making new investments, were devolved upon the trustees. Trustees may perform ministerial duties through an agent. But it is said that a trustee cannot delegate *discretionary* duties to an agent or to a cotrustee so as to absolve himself from responsibility. [1 Perry on Trusts (7 Ed.), secs. 402, 408.] And, "Where a settlor vests his property in several cotrustees, they all form, as it were, one collective trustee; therefore they must perform their duties in their joint capacity, even in making a purchase. In law there is no such person known as an *acting* trustee apart from his cotrustees. All who accept the office are acting trustees." [Ibid, sec. 411.] And in 3 Pomeroy's Equity Jurisprudence (4 Ed.), section 1082, we read that while a trustee is generally not responsible for the acts or defaults—the intentional or negligent breaches of trust— of a cotrustee, in which he has not joined or concurred, or to which he has not consented, or which he has not aided or made possible by his own negligence, "A trustee is responsible for the willful or negligent wrongful acts or omissions—breaches of trust—of his cotrustee to which he consented, or which by his own negligence he made it possible for his cotrustee to commit."

■ It is to be borne in mind that defendant is not charged or shown to have been guilty of any fraud or intentional wrongdoing or conversion of trust funds. For eighteen years he handled the business of the estate conscientiously, furnishing to his cotrustees and sole beneficiaries of the trust, regularly each year, a detailed report and accounting of his stewardship. Those reports showed the loans and investments that had been made and were on hand and the nature of the security. That they received scant attention from plaintiffs was no fault of defendant. Beginning with 1926 and continu-

ing thereafter the reports indicated that possible loss was threatened on some of the loans. Defendant requested the president of the board to advise and assist him and to call the board together for consultation but no heed was given to such requests. Except for the modest compensation paid him and the one small commission item of $25.50, which we are convinced was charged through mistake rather than intentional violation of trust and for which he offered and was by the court required to account, there is no evidence and no contention that defendant ever personally profited by his dealings with the trust estate. Some loss has resulted to the estate, due largely, no doubt, if not entirely, to the general depression and the depreciation of real estate values. Plaintiffs seek to hold defendant responsible for such loss on the ground that he was acting as sole trustee and as such failed to use the high decree of care and diligence which the law requires of a trustee. Even on that theory we are inclined to think that defendant cannot be justly charged with negligence in connection with the Oklahoma loans. The Durant loans were made by Mr. Cox, who was agent for the trustees, and, moreover, the evidence justifies the conclusion that, when made, they were reasonably considered good within the contemplation of testator's will. Defendant made the Tulsa (Cook and Adams) loans himself, but again the evidence justifies the conclusion that, at the time, he had good reason to believe and did believe that they were secured as the will required. In buying the Madison-Clark and Kenshire Apartments bonds defendant, while we think he probably exercised as much care and prudence as the average business man would have exercised in like circumstances in the handling of his own personal affairs, may have failed to measure up to the high standard of care required of one acting as trustee. [See Cornet v. Cornet, 269 Mo. 298, 190 S. W. 333.] And for the purposes of the case it may be conceded that the Madison-Clark bonds, secured by mortgage on a leasehold, did not comply with the will as to the nature of the security. But as to all these matters the plaintiffs themselves, as trustees, are as much responsible as the defendant. They not only failed to give attention to the discretionary duties and responsibilities which the will imposed upon them and which, by accepting the trust, they had bound themselves to perform, but they attempted to delegate those discretionary duties to defendant, telling him to use his own judgment. They made him their agent in the discharge of discretionary as well as ministerial or managerial duties, and told him to use his own judgment. Thus directed he did use his own judgment. That he acted honestly and in good faith cannot be doubted. Under the circumstances it seems clear to us that plaintiffs, as trustees, are at least as much responsible to beneficiaries of the trust as is the defendant for any loss that may have occurred by reason

of defendant's bad judgment, or his failure, if any, to use the high degree of care and diligence required of a trustee.

Plaintiffs are not only trustees but beneficiaries—the sole beneuciaries—of the trust. 3 Pomeroy's Equity Jurisprudence, section 1083, says, "A beneficiary who, subsequently to a breach of trust, acquiesces in it, cannot maintain a suit for relief against those who would otherwise have been liable. The acquiescence, in order to produce this effect, must take place with full information by the beneficiary of all the facts, and with full knowledge of his legal rights arising from those facts; in short it must have all the requisites of an acquiescence heretofore described, to defeat the liability of a defaulting trustee. . . . If a *cestui que trust* is a party to, or concurs in, or even assents to, a breach of trust by the trustee, he debars himself thereby of all claim for relief."

If it be conceded that in this case the plaintiffs, *as beneficiaries,* did not have that full and complete knowledge of the facts relative to the loans complained of and of their rights arising from such facts necessary to bar them on the ground of acquiescence, yet, *as trustees,* they neglected their duties and, as we have pointed out, are legally as much responsible as the defendant for the loss of which they now complain. They sue both as trustees and beneficiaries. Being both trustees and sole beneficiaries can they, as it were, dissociate themselves as beneficiaries from themselves as trustees and, ignoring their own neglect of duty and consequent responsibility as trustees, recover from defendant a loss for which, as trustees, they are legally responsible—at least as much so as the defendant? We think not. The case is unique in its facts. As said by the learned trial judge, "Had any of the plaintiffs been either a beneficiary or a trustee, without being both, the situation would be an entirely different one." He who seeks equity should do equity. Under the peculiar and unusual facts of this case it does not accord with our sense of justice nor, in our opinion, with principles of equity, to hold defendant liable to these plaintiffs for the loss complained of. We think the judgment of the circuit court is right and it is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.